Deepali Brahmbhatt (SBN 255646)
dbrahmbhatt@devlinlawfirm.com
Hayden B. Corrales (SBN 350580)
hcorrales@devlinlawfirm.com
DEVLIN LAW FIRM LLC
3120 Scott Blvd. #13
Santa Clara, CA 95054
Telephone:   (650) 254-9805

Timothy Devlin (*pro hac vice* forthcoming)
tdevlin@devlinlawfirm.com
DEVLIN LAW FIRM LLC
1526 Gilpin Avenue
Wilmington, DE 19806
Telephone: (302) 449-9010

*Attorneys for Plaintiffs and the Class*
*Cayden Crume, James LeGrand, Todd Holton*
*on behalf of themselves and all others similarly situated*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

## [WESTERN DIVISION]

| | |
|---|---|
| Cayden Crume, James LeGrand, and Todd Holton,<br><br>   *Plaintiffs,*<br><br>  v.<br><br>Mullen Automotive Inc., David Michery, Jonathan New, and Oleg Firer<br><br>  *Defendants.* | Case No. 2:25-cv-2620<br><br>PSLRA AND CONSUMER PROTECTION CLASS ACTION<br><br>JURY TRIAL DEMANDED |

Plaintiffs Cayden Crume, James LeGrand, and Todd Holton ("Plaintiffs"), individually and on behalf of all other persons similarly situated, bring this action against Defendant Mullen Automotive Inc., previously dba as Mullen Technologies Inc. ("Mullen") and officers David Michery, Jonathan New and Oleg Firer (collectively, "Defendants"), allege the following based on personal knowledge as to Plaintiffs and Plaintiffs' acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included among other things, a review of the Defendants' public documents, announcements, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by Defendants, and information readily obtainable on the Internet.  Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Mullen securities between May 2022 and the date of filing this Complaint, inclusive (the "Class Period").  Plaintiffs seek to recover compensable damages caused by Defendants' violations of federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act") and the rules promulgated thereunder.

## JURISDICTION AND VENUE

2.      The claims asserted herein arise pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

CLASS ACTION COMPLAINT                                    Case No. 2:25-cv-2620

4.     The venue is proper in this judicial district under §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as the alleged misstatements entered and the subsequent damages occurred in this judicial district.

5.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities exchange.

## PARTIES

6.     As set forth in the accompanying Certification, Plaintiffs purchased Mullen's securities at artificially inflated prices during the Class Period.  They were damaged upon the revelation of material misrepresentations and omissions and frequent reverse splits of Mullen's securities.  *See* Exhibit 1-3.

7.     Defendant Mullen is incorporated in Delaware and has its principal executive offices at 1405 Pioneer Street, Brea, California, 92821.  Mullen's shares trade on the NASDAQ exchange under the ticker symbol "MULN."

8.     As to Defendants David Michery, Jonathan New, and Oleg Firer (collectively the "Individual Defendants"): (i) Defendant David Michery ("Michery") has served as the Chief Executive Officer ("CEO") and Chairman of the Board of Directors of Mullen following the merger.  Before the merger, Defendant Michery served as the CEO of Mullen Technologies, Inc.  It is believed that Michery is a resident of this district.  (ii) Defendant Jonathan New ("New") has served as the Chief Financial Officer ("CFO") of Mullen since September 19, 2022.  Before serving as CFO, New was a director of Mullen from November 2021 until September 2022.  He also served as CFO of Motorsport Games, Inc. (NASDAQ: MSGM) from July 2018 to January 2020, during which time Mullen was alleged to have committed fraud and federal securities violations.  Mr. New

was also CFO of Mullen's predecessor, Net Element, Inc., from 2008 to July 2018. It is believed that New is a resident of this district.  (iii) Oleg Firer served as Mullen's CEO and Executive Director before the merger with Net Element Inc.

9.     The Individual Defendants directly participated at the top level of management of Mullen; they were directly involved in the day-to-day operations of Mullen at the highest level and responsible for the omission of material facts and misrepresentations alleged herein; they were privy to and directly involved in confidential and proprietary information concerning Mullen and it's business and operations; they were directly or directly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein; they were directly or indirectly involved in the oversight or implementation of Mullen's internal controls; they were aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning Mullen; and/or they approved or ratified these statements in violation of the federal securities laws.

10.    Mullen is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all the wrongful acts complained of herein were carried out within the scope of their employment.

11.    The scienter of the Individual Defendants is similarly imputed to Mullen under *respondeat superior* and agency principles.

## FACTUAL BACKGROUND

### A.     Materially False and Misleading Statements

12.    Mullen and Individual Defendants repeatedly engaged in a scheme to inflate Mullen's stock price through press releases making false or misleading statements or material omissions, often before it executed a reverse stock split. Mullen executed two initial reverse splits on May 24, 2016, and October 4, 2017.

In recent times, Mullen has executed five reverse stock splits: (i) May 3, 2023, at 25:1; (ii) August 10, 2023, at 9:1; (iii) December 20, 2023, at 100:1; (iv) September 16, 2024, at 100:1; (v) February 17, 2025, at 60:1 (Ex. 4, https://www.investing.com/equities/net-element-inc-historical-data-splits).

## Mullen Automotive (MULN) Splits History ⓘ

| Split date ⇅ | Split ratio ⇅ |
| --- | --- |
| Feb 17, 2025 | 0.0166667:1 Stock Split |
| Sep 16, 2024 | 0.01:1 Stock Split |
| Dec 20, 2023 | 0.01:1 Stock Split |
| Aug 10, 2023 | 0.1111111:1 Stock Split |
| May 03, 2023 | 0.04:1 Stock Split |
| Oct 04, 2017 | 0.1:1 Stock Split |
| May 24, 2016 | 0.1:1 Stock Split |

13.    On June 15, 2020, Mullen issued a press release (Ex. 5, https://www.sec.gov/Archives/edgar/data/1499961/000143774920013083/ex_190434.htm.) announcing its intent to merge Net Element with electric vehicle company, Mullen Technologies, Inc.  (Defendant Mullen was previously known as as Mullen Technologies Inc.)

14.     Mullen was expected to launch the Dragonfly K50, a luxury sports car, in the first half of 2021, but the date was pushed to the second half of 2021 because of the COVID-19 pandemic.  (*Id.*)

15.     Mullen boasted of creating a different business model to enter the EV market.  Its core tenets included fast-to-market, high efficiency, ready and proven vehicle technology leveraging existing technologies, with development time reduced from 4 years to 17 months (*Id.*)

16.     The MX-05, a full-electric and range-extended luxury SUV market entrant, was projected to proceed into full production in 2022.  (*Id.*)

"We believe the timing of this merger is ideal for Mullen Technologies," said Mr. Michery.  "It comes on the preparation of our launch of the Dragonfly K50, which will be available in Q2 of 2021 and through our retail network in California and Arizona and the development of a new EV model, the MX-05 Sport Utility Vehicle, that we expect the start of production next year.  In addition, becoming public at this time should allow us to accelerate the development of ***our unique battery technology which is non-flammable, puncture proof***, capable of maintaining full capabilities after 500,000 cycles, and is synthetic, requiring no mining of natural resources. We look forward to working with the Net Element team to complete the merger as quickly as possible."

17.     On December 15, 2020, Mullen issued a press release stating that the merger with Net Element Inc. was still in progress and that the ability to produce and sell automobiles was progressing well, with revenues improving despite continued shutdowns in New York and California.  (Ex. 6, https://news.mullenusa.com/nete-q3-2020-revenues-improve-despite-continued-shutdowns.)

18.     On November 15, 2021, Mullen issued a press release describing purported ramp-up in manufacturing facilities.  (Ex. 7, https://news.mullenusa.com/mullen-automotive-announces-it-now-owns-tunica-mississippi-ev-assembly-plant-free-and-clear.)

19.    Between February 2022 and February 2025, Mullen made exaggerated statements about its solid-state battery power range being in the 600-mile range when, in fact, it only achieved a roughly 200-mile range.  (Ex.  8-9.)

20.    The Hindenburg Report outlines the inconsistencies in Defendants' statements regarding their manufacturing capabilities, solid-state battery technology, questionable background, and past securities dealings.  (Ex. 10.)

21.    Mullen's share price fell 99% between April 2023 and April 2024.  As of April 15, 2024, Mullen's stock price dropped 73% in 2024, from $1,286.00 per share to $377.00 (adjusted for reverse splits) per share.  Mullen's share price had been artificially inflated due to the constant barrage of Defendants' false and misleading statements and material omissions of facts.  Mullen stock is currently trading below $2 per stock (also adjusted).

22.    The Defendants, their affiliates, and partners' public statements were materially false, misleading, and/or omitted material information, resulting in an artificially inflated share price.

23.    Mullen called a special shareholder meeting for December 3, 2022 (Ex. 11, https://www.marketbeat.com/originals/the-next-catalyst-for-mullen-automotive-stock-is-december-23rd/) to vote on four proposals, including: (1) a reverse stock split; (2) a switch of incorporation from Delaware to Maryland; (3) an increase in the number of allowable shares from 1.3 billion to 5 billion (despite just over 570 million of the then-current 1.3 billion shares having been issued, leaving plenty for Mullen to sell in the event it needed to raise capital); and (4) permission to issue new debt and class D shares to fulfill a prior securities agreement.

24.    On January 25, 2023, Mullen announced that it "has no plans at the current time to effect a reverse split."  (Ex. 12, https://news.mullenusa.com/mullen-announces-result-of-special-meeting-of-shareholders.)  Mullen had until March 6,

2023, to meet the Nasdaq minimum bid requirement of $1.00. If the share price of Mullen's stock fell short of the requirement, Mullen intended to seek an extension from NASDAQ to meet the required threshold. If such an extension was granted, compliance with the minimum $1.00 stock share threshold requirement could be extended for 180 days until approximately September 6, 2023.

25.     The announcement that there were no plans for a reverse split was made after and contrary to Mullen's proposals presented at the Special Meeting of Stockholders in December 2022, where Proposal No. 1 – The Reverse Stock Split Proposal passed.

26.     The Reverse Stock Split Proposal "grants Mullen . . . to effect a reverse stock split of our outstanding shares of common stock in an amount not less than 1-for-2 shares and not to exceed 1-for-25 shares, with the exact ratio to be set within that range at the discretion of our Board of Directors (the "Reverse Stock Split"); provided, however, that Mullen will not file such amendment before May 1, 2023, to effect the Reverse Stock Split unless needed to maintain continued inclusion in the Russell 2000, which requires a minimum stock price of $1.00 . . . the Board of Directors may effectuate the Reverse Stock Split at any time, and at such time and date, if at all, as determined by the Board of Directors in its sole discretion, but no later than December 1, 2023, when the authority granted in this proposal to implement the Reverse Stock Split would terminate." (Ex. 13, https://www.sec.gov/Archives/edgar/data/1499961/000110465923005913/tm2342 38d1_8k.htm.)

27.     Mullen's CEO Michery was in favor of and had every intention of effectuating the first reverse stock split at that time. This is evidenced by Mullen's issuance of a single Class AA preferred stock with inordinate voting power issued to Michery, which was redeemed soon after the proposal for the reverse stock split had been passed. Shortly before the announcement of the special meeting, Mullen

1  announced that Michery had bought a single share of Class AA preferred stock.

2  The cost of the single share was $25,000 and came with 1.3 billion votes, which

3  are counted in proportion to other voting class shares.  Michery's share was

4  immediately redeemable for cash upon the proposal's passage, and his votes are

5  counted in proportion to other voting class shares, demonstrating his intention to

6  effect the reverse split.  (Ex.  11, https://www.marketbeat.com/originals/the-next-

7  catalyst-for-mullen-automotive-stock-is-december-23rd/.)

8      28.    Michery and Mullen filed a notice of the Cancellation of the

9  Certificate of Designation of Series AA Preferred Stock (Michery's AA preferred

10  stock) after it had served its purpose in creating votes sufficient to pass proposals

11  related to the first reverse stock split (and then being automatically redeemed for

12  cash).  (Ex. 16,

13  https://www.sec.gov/Archives/edgar/data/1499961/000110465923008170/tm2349

14  57d1_ex3-1.htm.)

15      29.    "As reported in Mullen's Current Report on Form 8-K filed with the

16  Securities and Exchange Commission ("SEC") on November 14, 2022, Mullen

17  Automotive Inc. (the "Mullen") filed on November 14, 2022, a certificate of

18  designation with the Secretary of State of the State of Delaware that designated the

19  rights, preferences, privileges, and restrictions of one share of Series AA Preferred

20  Stock (the "Series AA Certificate of Designation")."  (*Id*.)

21      30.    On January 19, 2023, the Series AA Preferred Stock by its terms was

22  automatically redeemed, as described in Mullen's definitive Proxy Statement filed

23  with the SEC on November 25, 2022, and Amendments to Mullen's definitive

24  Proxy Statement filed with the SEC on December 16, 2022, and January 13, 2023,

25  (collectively, the "Proxy Statement", Ex. 14,

26  https://www.sec.gov/Archives/edgar/data/1499961/000110465923003823/tm2333

27  50d1_8k.htm, Ex. 15,

1  https://www.sec.gov/Archives/edgar/data/1499961/000110465923003804/tm2333
2  50d2_defr14a.htm).

3      31.    Under the terms of the Series AA Certificate of Designation, upon
4  redemption, the share of Series AA Preferred Stock redeemed was automatically
5  retired and restored to the status of an authorized but unissued share of preferred
6  stock, par value $0.001 per share ("Preferred Stock"), of Mullen.

7      32.    On January 30, 2023, Mullen filed a certificate of cancellation (the
8  "Certificate of Cancellation") with the Secretary of State of the State of Delaware,
9  effective as of the time of filing, canceling the Series AA Certificate of
10 Designation, and thereby eliminating all Series AA Preferred Stock.  The foregoing
11 description is qualified in its entirety by the full text of the Certificate of
12 Cancellation, which is filed as Exhibit 3.1 to this Current Report on Form 8-K and
13 is incorporated herein by reference.  (Ex. 16.)

14     33.    Mullen's share price increased with this announcement, reaching a
15 peak the following week.  However, the price soon fell steeply, with only
16 meaningful upticks in share price coincidingwith other fraudulent
17 misrepresentations or omissions, such as when Mullen announced a partnership
18 with Lawrence Hardge and his innovative battery technology.  (Ex. 17,
19 https://www.fastcompany.com/90917450/lawrence-hardge-mullen-automotive-ev-
20 battery.)

21     34.    Mullen announced on May 3, 2023, that "it will effect a 1-for-25
22 reverse stock split ("Reverse Stock Split") of its common stock, par value $0.001
23 per share ("Common Stock"), that will become effective on May 4, 2023, at 12:01
24 a.m., Eastern Time.  Mullen's Common Stock will continue to trade on The
25 Nasdaq Capital Market ("Nasdaq") under the existing symbol "MULN" and will
26 begin trading on a split-adjusted basis when the market opens on May 4, 2023.

27

9

### 1. Mullen's Joint Venture Mullen Advanced Energy Operations and Lawrence Hardge

35.     Less than one month before Mullen's first reverse split, on April 18, 2023, Mullen announced it was forming a joint venture, Mullen Advanced Energy Operations, LLC ("MAEO"), with Global EV Technology, Inc., to advance energy management technologies, starting with electric vehicles and scaling to other energy applications.  (Ex. 19, https://news.mullenusa.com/mullen-automotive-inc.-forms-mullen-advanced-energy-operations-llc; *see also* Ex. 18.)

36.     Mullen's press release announcing the joint venture stated that under the newly formed entity, Mullen "owns 51% and will consolidate the results of its operations in Mullen Automotive, Inc.  Under the agreement between the parties, Global EV Technology will be contributing its technology and existing contracts to MAEO, and Mullen will provide capital, execution, and commercialization to grow the business." (*Id*.)

37.     The release further stated: "Both companies will be contributing and working together on known verified technology for improving existing vehicle performance and extending battery range.  As this technology has immediate and key implications for electric vehicles, MAEO's initial development is focused on improving Mullen's lineup of commercial and consumer EVs."  (*Id.,* emphasis added.) The release further stated: "The founder of Global EV Technology Inc. and chief scientific officer, Lawrence Hardge, is a successful life-long inventor with a storied career of over 30 yrs.  Lawrence's accomplishments include the following:

• Holds over 120 intellectual prototypes as well as numerous patents and trademarks.

• Inventor of Knock Out 360 Fire Extinguisher.  One of the only extinguishers in the U.S. market that is UL-approved for use in electric vehicle fires.

• Featured in various magazines, including Barron's.

10

• Received Spirit Award from the Detroit City Council for providing Knock Out 360 Extinguishers to local residents.

• Lifelong resident of his hometown, Vicksburg, Mississippi, with a dedicated focus on helping his community.

• Provided scholarships to high school students who achieved honor roll status who otherwise could not afford to attend college, as well as provided clothing, computers, housing, and utilities.

• Honored by the town of Vicksburg for black history month." *Id*.

38.    In the release, Hardge stated: "My partnership with Mullen is very important to help scale this energy technology and bring it to our existing and future customers." *Id*.

39.    The release further stated: "Lawrence is a talented inventor, and we are excited to begin working with him on improving electric vehicle performance," said David Michery, CEO and chairman of Mullen Automotive. "We are always looking for forward-thinking and ground-breaking technology opportunities and are pleased to partner with Global and EV Technologies." *Id*.

40.    In yet another boastful and misleading announcement, Mullen, in conjunction with MAEO, announced it had made a "Major Energy Advancement" based on "test results of its recently acquired joint venture technology, greatly improving current EV performance by increasing EV vehicle range." (Ex. 20, https://www.globenewswire.com/news-release/2023/04/20/2651082/0/en/Mullen-Advanced-Energy-Operations-Announces-Major-Energy-Advancement.html.)

41.    "The company says that the results showed more than a 75% increase in range for the 42-kWh lithium-ion battery pack, which would be a calculated EPA estimated range of 186 miles at a very low added cost and mass." (Ex. 32.) "EMM technology is being integrated into the final stages of product development and is planned to be introduced in all Mullen commercial and consumer vehicle

11

1  programs." (*Id*.)  U.S. provisional patent application has been filed covering the

2  technology." (Ex. 39.)

3      42.   Mullen Automotive owns 51% of MAEO, LLC and will consolidate

4  the results of its operations in Mullen Automotive, Inc.  (Ex. 19.)

5      43.   "We have tested EMM technology in various vehicle applications and

6  have repeatedly seen significant improvements in range.  I am extremely pleased to

7  partner with Mullen for the commercialization and global availability of the EMM

8  technology," said Lawrence Hardge, CEO of Global EVT.  (Ex. 20.)

9      44.   "Seeing the previous EMM test results conducted by Element, along

10  with Global EVT testing, and correlating that with testing by our engineers, we

11  believe this technology is a perfect fit for Mullen's EV product lineup as well as the

12  advancement in EV technology for the overall automotive industry," said David

13  Michery, CEO and chairman of Mullen Automotive.  "Mullen Advanced Energy

14  Operations plans on licensing this technology to anyone who uses an electric

15  vehicle." *Id*.

16      45.   Mullen's press release on April 18, 2023, stated, "In the late 90s,

17  Lawrence was convicted of a state crime, which was ultimately expunged.  Despite

18  these challenges, Lawrence focused his energy and attention on his natural gift for

19  inventions related to electrical equipment and batteries and has dedicated his career

20  to bringing them to market." (Ex. 19.)

21      46.   Immediately following Mullen's first reverse stock split, it announced

22  its "Energy Management Module ("EMM") technology was tested by Hardge and

23  Mullen engineers on Mullen's EV Cargo Van at its Troy, Michigan, facility, with

24  testing results showing an increased battery capacity of 44%." (Ex. 21,

25  https://news.mullenusa.com/mullen-automotive-provides-business-update.)

26      47.   Mullen and MAEO's announcements with Hardge came following

27  allegations and litigation about alleged previous false and misleading statements

CLASS ACTION COMPLAINT                           CASE NO. 2:25-CV-2620

regarding Mullen's battery technology.  Mullen and Michery were attempting to rebut the damning allegations put forth in the Hindenburg report (Ex. 10) regarding Mullen and its solid-state battery technology, which stated the following, in pertinent part regarding Mullen's battery technology and capabilities:

• Mullen's stock has spiked ~316% in the past couple of months, driven by retail investor euphoria over bold claims of ground-breaking technology, near-term production of its EV vans, and a major as-yet-unnamed Fortune 500 customer. (Ex. 10.)

• Despite spending only ~$3 million in R&D in 2021, Mullen claims its solid-state battery technology is on track for commercialization in 18 to 24 months, putting it ahead of every major technology and automaker in the industry, which has collectively invested billions in solving the problem. (Ex. 10.)

• Mullen recently press released an update on its battery testing, sending its stock soaring 145% in a day.  In reality, the "news" appears to be a rehash of testing Mullen had already announced in 2020.  (Ex. 10.)

• Mullen apparently misrepresented the test results, according to Mullen's CEO, who performed the tests.  Its CEO told us of Mullen's press release: "We never would have said that.  We never did say it and certainly wouldn't have said it based on the results of testing that battery."  (Ex. 10.)

• Then, on February 28, 2022, Mullen made a surprising announcement.  Despite spending only $3 million in R&D during its entire fiscal 2021, Mullen claimed it had made progress and "significant advancement"' on the development of solid-state batteries, a widely regarded "holy grail" of the EV battery industry that has long-eluded tech and automaker giants such as Panasonic and Volkswagen.  The stock rallied ~145% on the day.  (Ex. 10.)

13

48.    Mullen shares closed higher on April 18, 2023, by 25%, following the submission of a Form 8-k detailing the MAEO Joint Venture, adding that the purpose was to advance a device previously known as a battery life-enhancing technology along with ever-charge technology and/or an energy management module.

49.    Mullen, on May 15, 2023, announced "an update on the pilot program contract for installation of Energy Management Modules ("EMM") on Washington, D.C., city government's fleet of vehicles.  The $680,000 contract was previously awarded by the District of Columbia, Washington, D.C., to EV Technologies, LLC. for the purchase and installation of EMM units on Chevrolet Bolts within the D.C. city government's vehicle fleet." (Ex. 33.)  The announcement added that:

> Mullen Advanced Energy Operations ("MAEO") is supporting EV Technologies for the execution of the contract, which started on April 24, 2023.  MAEO, which is a 51%-owned subsidiary of Mullen Automotive, is a collaboration with Global EV Technology, Inc. ("Global").

> MAEO has named Lawrence Hardge, senior vice president of technology. Lawrence will oversee all technological aspects of the Energy Management Module ("EMM") applications.

> We look forward to completing our installation work here in D.C., and the next steps as vehicles enter the fleet with our EMM and also future opportunities with the local and federal government agencies," said Lawrence Hardge, CEO of EV Technologies, LLC.

> "As testing and installations continue in D.C., we will provide further updates," said David Michery, CEO and chairman of Mullen Automotive. (*Id.*)

50.    On the heels of Mullen's May 15, 2023, announcement, Chief Science Officer Lawrence Hardge announced via Facebook Live a ten billion dollar contract with Saudi Arabia. (Ex.  22, https://franknez.com/mullen-ceo-clears-the-

1    air-on-new-saudi-deal/.)  Later, however, it would be announced that Mullen

2    technology would be excluded the deal, and thus the purported "contract" would

3    never benefit Mullen or its stock.

4        51.     Mullen CEO David Michery did not publicly state anything about the

5    Saudi Deals until June 6, 2023, after receiving the benefit of the stock bump.  (*Id.*)

6    Michery said Hardge has a carve-out for the sales in the Middle East, and Mullen

7    agreed to that carve-out exclusion.  Hardge's Saudi deals have "no impact" on

8    Mullen, and Michery reviewed no documents regarding any purported Saudi

9    Deals.  None of this information was disclosed in Mullen's April 18, 2023

10   announcement.  Nevertheless, Michery and Mullen projected confidence and trust

11   in Hardge.  Based on subsequent facts regarding Hardge's background that

12   surfaced (namely, Hardge's convicted felony), it is clear that Defendants failed to

13   conduct sufficient good-faith diligence in their partnership with Hardge.  (Ex. 17.)

14        52.     Mullen's July 10, 2023, Form 8-K finally informed investors that

15   Mullen had terminated its relationship with Lawrence Hardge and Global EV

16   Technology, Inc.

17        53.     On July 10, 2023, Mullen issued a notice terminating the agreement of

18   April 17, 2023.  The termination notice, which was sent after numerous attempts

19   by Mullen to obtain adherence by EVT to the terms of the agreement, references

20   several breaches by EVT, including (1) failing to execute documents evidencing an

21   irrevocable, royalty-free, worldwide exclusive license to the Technology and IP, in

22   perpetuity, to MAEO, (2) refusing to conduct any tests of the technology at a

23   Mullen approved facility after the LOA, (3) repeatedly refusing to honor the terms

24   of the Mutual Non-Disclosure Agreement signed April 14, 2023, and (4) failing to

25   disclose all claims or threatened legal actions by any third parties related to the

26   technology.  MAEO has not had significant transactions since its formation.

27

54.     Since March 31, 2023, Mullen's stock has declined over 95%, from $3.25 per share to $0.16 on June 20, 2023.  As of June 13, 2023, Mullen's common stock trades at a discount to Mullen's cash value per common share of $0.38.  (Ex. 34.)

55.     Despite the decline in stock price, Mullen made statements that its management believed Mullen had already met or was positioned to meet the previously announced objectives.  Mullen purportedly had sufficient capital on hand for at least the next 12 months.

### 2.     Mullen Has Omitted Material Information Related to its Financing With Esousa Holdings

56.     Mullen has completed and/or amended multiple financing agreements with Esousa Holdings.  (Ex. 23, https://www.sec.gov/Archives/edgar/data/1499961/000182912624004615/mullenautomotive_424b3.htm.)  Mullen has failed to disclose material information about the individual who controls Esousa Holdings, Michael Wachs.

57.     Michael Wachs, the managing member of Esousa Holdings, LLC, has sole voting control and investment discretion over securities beneficially owned directly by Esousa Holdings, LLC.

58.     Mullen announced the following relevant financing agreements or amendments, resulting in Esousa Holdings, LLC holding a significant percentage of Mullen's shares of common stock, as seen from subsequent SEC filings (Ex. 24-26).

a. A Letter Agreement, dated May 15, 2023, an amendment to the Securities Purchase Agreement dated June 7, 2022, delaying the purchase date until June 12, 2023 (Ex. 24.);

b.  "On May 21, 2024, Mullen entered into a common stock purchase agreement (the "Purchase Agreement") with Esousa Holdings, LLC (the "Investor" or "Selling Stockholder") pursuant to which the Investor has

16

agreed to purchase from Mullen, at Mullen's direction from time to time, in its sole discretion, from and after the effective date of the registration statement, of which this prospectus forms a part, and until the earlier of (i) the 36-month anniversary of the Commencement Date (as defined below) or (ii) the termination of the Purchase Agreement in accordance with the terms thereof, shares of Mullen's Common Stock, having a total maximum aggregate purchase price of $150,000,000 (the "Purchase Shares"), upon the terms and subject to the conditions and limitations set forth therein." (Ex. 25.)

c.  "On August 27, 2024, pursuant to the common stock purchase agreement dated May 21, 2024, (the "Purchase Agreement") between Esousa Holdings LLC (the "Investor") and Mullen Automotive Inc. (the "Mullen"), as previously reported in Mullen's Current Report on Form 8-K filed with the Securities and Exchange Commission (the "SEC") on May 24, 2024, Mullen issued 13,816,105 shares of common stock to the Investor as 'Commitment Shares'" (Ex. 26);

d.  "On May 21, 2024, Mullen entered into the ELOC Purchase Agreement with Esousa, pursuant to which Esousa had agreed to purchase from Mullen, at Mullen's direction from time to time, in its sole discretion, from and after July 5, 2024, and until the earlier of (i) the 36-month anniversary of the commencement date of July 16, 2024, or (ii) the termination of the ELOC Purchase Agreement in accordance with the terms thereof, shares of Common Stock, having a total maximum aggregate purchase price of $150,000,000, upon the terms and subject to the conditions and limitations set forth therein.  Pursuant to the ELOC Purchase Agreement, Mullen issued to Esousa an aggregate of 247,935 shares of Common Stock as commitment shares and on October 23, 2024, Mullen

issued 502,066 shares of Common Stock." (Ex. 35, see also Ex. 36.);

e.  In connection with the ELOC Purchase Agreement, Mullen also entered into a registration rights agreement with Esousa, pursuant to which Mullen agreed to file a registration statement, and any additional registration statements, with the SEC covering the resale of the shares of Mullen's Common Stock issued to Esousa pursuant to the ELOC Purchase Agreement..(Ex. 25);

f.  On January 23, 2025, Mullen entered into a securities purchase agreement with Esousa and JADR whereby the investors purchased an aggregate principal amount of approximately $6.3 million of 5% Original Issue Discount Secured Notes convertible into shares of Common Stock and five-year warrants exercisable on cash basis for 32,388,664 shares of Common Stock.  The terms and conditions of the notes and warrants are further described in Mullen's Current Report on Form 8-K filed with the SEC on January 27, 2025. (Ex. 37);

59.    The Company failed to disclose material information that Mr. Wachs had pled guilty in 1997 to defrauding Chase Manhattan Bank for $20 million.  (Ex. 27, https://www.washingtonpost.com/archive/business/1998/07/16/digest/8aaa5902-74de-4f34-91eb-f35374f25521/.)

### 3.    Misleading Partnership With RRDS

60.    March 6, 2023, press release also stated in part that RRDS, one of the country's leading small business federal contractors, has executed over 2,500 federal government delivery orders since 2014.  Mullen currently holds a prime seat on 12 IndefiniteDelivery/IndefiniteQuantity (IDIQ) federal contracts with combined funding ceilings of $4 billion.  (Ex. 28,

18

https://news.mullenusa.com/rapid-response-defense-systems-selects-mullen-automotive-as-the-exclusive-provider-for-class-1-ev-cargo-vans.)

61.    "RRDS is all about providing solutions to the federal government," said Mullen's Manager of Government Sales, Ronald Dixon.  "Whether its designing products to meet Department of Defense mission requirements or enhancing supply chain logistics, they have a remarkable success record.  In addition, RRDS will be a key vehicle supplier to the General Service Administration in an awarded 5-year multibillion-dollar vehicle contract.  We are focused on selling our EV products to the federal government and view this relationship as a strategic step in accomplishing that goal." (*Id*.)

62.    "With the federal government's strong interest in electrifying a growing portion of its vehicle fleet, Mullen's commercial portfolio is very well positioned," said RRDS SVP – Federal Fred Bouman.  "Mullen's Class 1 EV cargo van launches this year and will be the only class 1 EV van in the market.  It is 100% electrified, making it a strong fit for federal government business." (*Id*.)

63.    "Mullen Automotive is proud to team up with RRDS for U.S. government fleet opportunities for our Class 1 EV cargo vans," said Mullen's CEO and Chairman, David Michery.  "We look forward to working closely with RRDS in meeting the demand for EVs across the U.S. government's fleet of vehicles." (*Id*.)

64.    Mullen issued an update on the RRDS partnership via a press release on November 24, 2023.

65.    That press release stated in the relevant part:

> Mullen and Rapid Response Defense Systems ("RRDS") have filed responses for final ruling and compliance by the U.S. Customs and Border Protection ("CBP") application for Mullen's Class 1 EV cargo van.  (*Id*.)

19

66.    Mullen issued an update on the RRDS partnership via a press release on March 13, 2024 stating, "On behalf of Mullen, RRDS filed the Ruling Request Application, which details the substantial transformation Mullen completed for the Class 1 EV cargo van to meet U.S. Federal Motor Vehicle Safety Standards and Environmental Protection Agency regulations, including the design, testing, and validation of new safety systems including airbags, sensors and control modules, rearview camera, front bumper system, wiring harnesses, and seating.  By completing the substantial transformative process, Mullen ONE will be defined as a U.S.-made end product."  (Ex. 38.)

67.    Mullen issued an update on the RRDS partnership via a press release on March 13, 2024 stated in part:

> On March 5, 2024, U.S. Customs and Border Protection informed Rapid Response Defense Systems ("RRDS") counsel that the U.S. General Services Administration ("GSA") needs to issue a final determination on the ruling request.

> Based on CBP advice, Mullen and RRDS are now proceeding with the GSA to finalize Mullen's qualification to sell Class 1 EV cargo vans to all branches of the U.S. government.

> "Mullen is well positioned to support the U.S. government's goal of transitioning its fleet to electric vehicles," said David Michery, CEO and chairman of Mullen Automotive.

(Ex. 29, https://www.globenewswire.com/news-release/2024/03/13/2845543/0/en/Mullen-Automotive-Provides-Timeline-Update-on-US-Government-Ruling-for-Class-1-EV-Cargo-Vans.html..)

68.    Upon information and belief, Mullen has not successfully submitted the necessary information required for Mullen or its partner RRDS to participate or receive a benefit from government contracts.  Mullen has not at any point been on a "fast-track" to achieve opportunities for large-scale vehicle fleet orders from the U.S. Federal Government.  The statements and implications set forth above were

20

false and/or misleading.  Additionally, Mullen omitted from its November 24, 2023 and March 13, 2024 press releases regarding the RRDS contract that a final ruling and compliance would need to be issued by the GSA instead of CBP.

### 4.    Defendants' Misleading Statements Continue

69.    David Michery on behalf of Mullen made the following announcement on X to promote Volt Mobility deal in August of 2024.  (Ex. 30.)



70.    An 8-K filing with the SEC filed on March 20, 2025, states that the deal was terminated.  (Ex. 31.)

### 5.    Defendants' Further Misleading Statements

71.    The June 15, 2020 press release which announced the merger between Net Element, Inc. and Mullen Technologies, Inc., Mullen Technologies stated that it "expects to launch the DragonFly K50, a luxury sports car, in the first half of

21

2021 through ICI (Independent Commercial Importers)."  The DragonFly K50 is a luxury sedan supercar manufactured by Qiantu out of China, introduced in 2015. In December 2018, Mullen and Qiantu announced a cooperation agreement to produce cars in North America.  Mullen introduced the DragonFly to the U.S. market in April 2019 at the New York International Auto Show.  However, following the revelation, Mullen immediately defaulted on its payment obligations to Qiantu, leading to the termination of the Agreement in November 2019.  Despite this, Mullen continued to market the vehicle as its own, even going so far as to solicit reservations for the vehicle, calling it the "Mullen K50" on social media posts.

72.     Mullen made another materially false and/or misleading statement by claiming that its Tunica, Mississippi facility, its Advanced Manufacturing Engineering Center (AMEC), was fully stocked with state-of-the-art equipment and machinery.  Mullen acquired the manufacturing facility on November 12, 2021, from GreenTech Automotive, which intended to produce a small two-seater electric vehicle at the facility.  According to the Mississippi State Auditor, GreenTech's electric car plant closed before producing a car.  Some media reports said that GreenTech may have produced a total of 25 vehicles at the Tunica plant, but not a single one was reportedly sold.  A 2017 review by the Mississippi State Auditor noted that the assembly equipment and car parts offered as loan collateral by GreenTech amounted to only $3.4 million in value.  Mullen stated that "AMEC is fully tooled with state-of-the-art equipment and machinery," yet, as noted in a Hindenburg Research article, Mullen's website had a brief video showing the interior of the factory which appears only to show "storage space, tables and chairs for employees, and several lifting cranes.  It does not appear from the video that there are any assembly lines, or robotic manufacturing."  (*See* Ex. 10.)

73.    Moreover, Mullen's website featured one picture showing advanced manufacturing robots, yet an online search revealed an identical stock photograph that appears to have been purchased from Adobe stock images.  (*See* id.)

74.    Mullen and David Michery continued to make false and misleading statements, such as statements related to the Volt Mobility deal and subsequent termination.  (Ex. 30-31.)  The statements referenced above, made by or attributed to Defendants, were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to Mullen's business, operational, and financial results, which were known to Defendants or recklessly disregarded by them.  Such false and/or misleading statements included:: (1) Mullen had no intent of implementing a reverse stock split when, in fact, the CEO and Mullen believed one was imminent and necessary; (2) overstating its deals with business partners, including RRDS and MAEO (3) overstating its battery technology capabilities and partnerships (i.e., Lawrence Hardge related allegations); (4); misleading the investing public about its further reverse splits (5) failing to provide diligence and/or disclosure regarding Lawrence Hardge's previous convictions for financial crimes and moral turpitude; (6) failing to disclose material information about Mullen's financing agreements.   Defendants' public statements were materially false and/or misleading at all relevant times.

75.    As a result of Defendants' wrongful acts and omissions, and the decline in the market value of Mullen's securities, Plaintiffs and other Class members have suffered significant losses and damages.

76.    Throughout the course of Mullen's false and/or misleading statements and omissions discussed above, Mullen's stock price fell over $3.25 per share, or 96%, to close at approximately $.015 per share on March 13, 2024, on unusually heavy trading volume, damaging investors including Plaintiffs and other Class members.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

77.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all those who owned, purchased or otherwise acquired the publicly traded securities of Mullen during time period of March, 2023 to March, 2025 ("the Class Period") (the "Class") and were damaged by Defendants' false and/or misleading statements and omissions and the resulting stock fluctuations.  Excluded from the Class are Defendants herein, the officers and directors of Mullen, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest, the assigned Judge and Magistrate Judge and their staffs.

78.    The members of the Class are so numerous that the joinder of all members is impracticable.  Throughout the Class Period, Mullen's securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Mullen or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

79.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

80.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

24

81.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a. whether Defendants' acts as alleged violated the federal securities laws;

b. whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of Mullen;

c. whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

d. whether the Individual Defendants caused Mullen to issue false and misleading SEC filings and public statements during the Class Period;

e. whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

f. whether the prices of Mullen's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

g. whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

82.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since the joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it

impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in managing this action as a class action.

83. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a. Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b. the omissions and misrepresentations were material;

c. Mullen's securities are traded in efficient markets;

d. Mullen's securities were liquid and traded with moderate to heavy volume during the Class Period;

e. Mullen traded on the NASDAQ and was covered by multiple analysts;

f. the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of Mullen's securities;

g. Plaintiffs and members of the Class purchased and/or sold Mullen's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

h. Unexpected material news about Mullen was rapidly reflected in and incorporated into Mullen's stock price during the Class Period.

58. Based upon the foregoing, the Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

59. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## CLAIM COUNTS

### COUNT I

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Against All Defendants

84.    Plaintiffs repeat and reallege each allegation contained above as if fully set forth herein.

85.    This Count is asserted against Mullen and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

86.    During the Class Period, Mullen and the Individual Defendants, individually and/or in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

87.    Each of Mullen and/or the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes, and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Mullen's securities during the Class Period.

88.    Each of Mullen and/or the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Mullen were materially false and misleading; they knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or

CLASS ACTION COMPLAINT                                    CASE NO. 2:25-CV-2620

dissemination of such statements or documents as primary violations of the securities laws.  These Defendants, by virtue of their receipt of information reflecting the true facts of Mullen, their control over, and/or receipt and/or modification of Mullen's allegedly materially misleading statements, and/or their associations with Mullen, which made them privy to confidential and proprietary information concerning Mullen, participated in the fraudulent scheme alleged herein.

89.    Each of the Individual Defendants, who are the senior officers and a director of Mullen, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the truth in the statements made by them or other personnel of Mullen to members of the investing public, including Plaintiffs and the Class.

90.    Due to the foregoing, the market price of Mullen's securities was artificially inflated during the Class Period.  In ignorance of the falsity of Mullen's and the Individual Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of Mullen's securities during the Class Period in purchasing Mullen's securities at prices that were artificially inflated as a result of Mullen's and the Individual Defendants' false and misleading statements.

91.    Had Plaintiffs and the other members of the Class been aware that the market price of Mullen's securities had been artificially and falsely inflated by Mullen and the Individual Defendants' misleading statements and by the material adverse information that Mullen and the Individual Defendants did not disclose, they would not have purchased Mullen's securities at the artificially inflated prices that they did, or at all.

92.  As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

93.  Because of the foregoing, Mullen and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchases of Mullen's securities during the Class Period.

## COUNT II
### Violation of Section 20(a) of The Exchange Act Against the Individual Defendants

94.  Plaintiffs repeat and reallege each allegation contained in the foregoing paragraphs as if fully set forth herein.

95.  During the Class Period, the Individual Defendants participated in the operation and management of Mullen and conducted and participated, directly and indirectly, in the conduct of Mullen's business affairs.  Because of their senior positions, they knew the adverse non-public information regarding Mullen's business practices.

96.  As senior officers of Mullen, the Individual Defendants had a duty to disseminate accurate and truthful information concerning Mullen and to promptly correct any public statements issued by Mullen that had become materially false or misleading.

97.  Because of their position of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases, and public filings that Mullen disseminated in the marketplace during the Class Period.  Throughout the Class Period, Individual Defendants exercised their power and authority to cause Mullen to engage in the

CLASS ACTION COMPLAINT                                    CASE NO. 2:25-CV-2620

wrongful acts complained of herein. The Individual Defendants, therefore, were each a "controlling person" of Mullen within the meaning of Section 20(a) of the Exchange Act. In this capacity, each participated in the unlawful conduct alleged, which artificially inflated the market price of Mullen's securities.

98.    Each of the Individual Defendants, therefore, acted as a controlling person of Mullen. Because of their senior management position, the Individual Defendants each had the power to direct the actions of and exercised the same to cause Mullen to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over Mullen's general operations. They each possessed the power to control the specific activities that comprise the primary violations about which Plaintiffs and the other Class members complain.

99.    Because of the above conduct, each of the Individual Defendants is liable under Section 20(a) of the Exchange Act for the violations committed by Mullen.

## COUNT III
## Unjust Enrichment

100.    Plaintiffs repeat and reallege each allegation contained in the foregoing paragraphs as if fully set forth herein.

101.    Through the conduct described herein, Defendants, individually and collectively, received and retained tangible benefits at the expense of Plaintiffs and the Class, including making questionable dealings without diligence and making misleading statements regarding the same as described above.

102.    Each of the Defendants, directly or indirectly, have received and retained information regarding stock price fluctuations and frequent reverse splits at the cost of the Plaintiffs and the Class. Each Defendant appreciates or has knowledge of said benefits.

103.   Under principles of equity and good conscience, Defendants should not be permitted to retain the revenue each acquired through their unlawful conduct.  Each Defendant's conduct is unlawful because it violates the securities and consumer protection laws as discussed above.

104.   Defendants have lured Plaintiffs and Class Members into investing in the Mullen stock.  Plaintiffs and Class Members incorporate and reallege all allegations set out in the paragraphs above.  Defendants have misled and misinformed Plaintiffs and Class Members.

105.   All funds, revenues, and benefits Defendants have, jointly or individually, unjustly received due to their actions rightfully belong to Plaintiffs and the Class.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure and certifying Plaintiffs as the Class representative;

B. Requiring Defendants, jointly and severally,  to pay damages sustained by Plaintiffs and the Class because of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees, and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury.

Dated: March 26, 2025                **DEVLIN LAW FIRM, LLC**

By: */s/ Deepali A. Brahmbhatt*
Deepali A. Brahmbhatt (SBN 255646)
dbrahmbhatt@devlinlawfirm.com
Hayden B. Corrales (SBN 350580)
hcorrales@devlinlawfirm.com
DEVLIN LAW FIRM LLC
3120 Scott Blvd. #13
Santa Clara, CA 95054
Telephone:   (650) 254-9805

Timothy Devlin (*pro hac vice* forthcoming)
tdevlin@devlinlawfirm.com
DEVLIN LAW FIRM LLC
1526 Gilpin Avenue
Wilmington, DE 19806
Telephone: (302) 449-9010

*Attorneys for Plaintiffs*
*Cayden Crume, James LeGrand, and Todd*
*Holton, and on behalf of themselves and all*
*others similarly situated.*